# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 6, 2026          Decided July 28, 2026

No. 25-1106

THE ESTATE OF STEPHEN M. JENNIONS,
PETITIONER

v.

COMMODITY FUTURES TRADING COMMISSION,
RESPONDENT

———

On Petition for Review of Orders
of the Commodity Futures Trading Commission

———

*Stephen S. Hasegawa* argued the cause and filed the briefs for Petitioner. With him on the briefs were *Erika A. Kelton* and *Samuel E. Brown*.

*Raagnee Beri*, Senior Assistant General Counsel, Commodity Futures Trading Commission, argued the cause for Respondent. With her on the brief were *Tyler Badgley*, General Counsel and *Anne W. Stukes*, Acting Deputy General Counsel.

Before: PILLARD, WILKINS, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Stephen M. Jennions ("Jennions") petitions for review of the Commodity Futures Trading Commission's ("CFTC" or "Commission") final orders denying his application for a whistleblower award. His award application corresponded to a set of administrative actions ("Covered Actions") taken by the Commission in November 2014 against five banks for manipulating benchmark rates in the foreign exchange market. Jennions contends that the denial was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the information he provided the Commission set the agency's investigation in motion and led to a successful enforcement action against the five banks. *See* 17 C.F.R. § 165.2(i)(1). He further alleges that other departments within the CFTC exerted undue influence that contributed to the denial of his application.

We disagree. The CFTC properly denied Jennions's application after reasonably determining that he did not provide the Commission with original information that was sufficiently specific and credible to cause the Commission staff to commence their investigation into the five banks. The Commission also reasonably rejected Jennions's claim that there was undue control or influence within the Commission that contributed to the denial of his application as there is no record evidence to support his contention. And even assuming some inter-Commission participation occurred in violation of the Commission's regulations, Jennions still failed to identify any resulting prejudice from that alleged violation that affected the outcome of his application. *See* 5 U.S.C. § 706(2). We therefore deny the petition for review.

3

**I.**

**A.**

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") amended the Commodity Exchange Act to authorize monetary awards for whistleblowers who provide the Commodity Futures Trading Commission with information about violations of the Commodity Exchange Act. Pub. L. No. 111-203, § 748, 124 Stat. 1739–47 (2010) (codified at 7 U.S.C. § 26); *see also* 17 C.F.R. § 165.1. To be eligible to receive a monetary award, a whistleblower must "voluntarily provide[] original information to the Commission that le[ads] to the successful enforcement of [a] covered judicial or administrative action." 7 U.S.C. § 26(b)(1). The Dodd-Frank Act defines "original information" as information that "is derived from the independent knowledge or analysis of a whistleblower"; "is not known to the Commission from any other source, unless the whistleblower is the original source of the information"; and "is not exclusively derived . . . from the news media, unless the whistleblower is a source of the information." 7 U.S.C. § 26(a)(4); *see also* 17 C.F.R. § 165.2(k)(1)–(3).

The regulations implementing the whistleblower award program set forth three circumstances detailing when information could have "led to" to a successful enforcement action. *Whistleblower Incentives and Protection*, 76 Fed. Reg. 53172, 53201 (August 25, 2011). Each circumstance requires the whistleblower to have submitted the information directly to the CFTC. 17 C.F.R. § 165.2(i)(1)–(3). And particularly relevant here, the information provided must be "sufficiently specific, credible, and timely to cause the Commission staff to commence an examination, [or] open an investigation" into the alleged violation that prompts the agency to "br[ing] a

successful judicial or administrative action based in whole or in part on conduct that was the subject of the whistleblower's original information[.]" *Id.* § 165.2(i)(1).

**B.**

This case focuses on CFTC Orders against five banks regarding the manipulation of the World Markets/Reuters ("WM/R") Closing Spot Rates ("WM/R Rates"). SJ_ROA0000250. The WM/R Rates are widely used foreign-exchange benchmark rates that establish relative currency values and are used to price cross-currency swaps, foreign-exchange swaps, spot transactions, forwards, options, futures, and other derivative instruments. *Id.* Accordingly, "the integrity of the WM/R Rates and other FX benchmarks is critical to the integrity of the markets in the United States and around the world." *Id.* The most widely used WM/R rate is set at 4 p.m. London time (the "4 p.m. WM/R fix"). Respondent's Br. 5; SJ_ROA0000140. The 4 p.m. WM/R fix is calculated using bids and offers extracted from an electronic trading system during a 60-second window ("fix period"), from which WM/R determines a median-based mid-trade rate. *Id*. Large transactions executed before and during the fix period can influence the resulting rate. *Id.*

On January 7, 2013, Jennions voluntarily provided the United Kingdom's Financial Conduct Authority ("UK FCA" or "UK Authority") information concerning alleged manipulation of foreign-exchange benchmark rates. In his initial communication, Jennions described practices he observed while working at Deutsche Bank and Morgan Stanley in which traders executed transactions before the fix period to obtain preferential pricing for banks at the expense of customers requesting execution at the 4 p.m. WM/R fix. **[*Id.*]**

Jennions continued assisting the UK FCA over several months and provided additional information to the UK Authority.

On June 12, 2013, the news outlet *Bloomberg* reported that traders at several large banks manipulated foreign exchange benchmarks used to value trillions of dollars in investments. SJ_ROA0000234–240; Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013, at 14:06 EDT), https://perma.cc/CR86-TEEP. The article described traders attempting to influence the 4 p.m. WM/R fix by front-running client orders and executing trades during the close of the trading session. SJ_ROA0000234; Respondent's Br. 9–10. Citing anonymous traders with knowledge of these trades, the article also reported that traders shared order information through instant messaging to coordinate strategies and exert pressure on benchmark rates. SJ_ROA0000234, 238. The article further reported that the UK FCA was already "working with regulators worldwide to review the integrity of benchmarks" following earlier related enforcement actions. SJ_ROA0000235. The Bloomberg Article quoted a UK FCA spokesperson saying, "[t]he FCA is aware of these allegations and has been speaking to the relevant parties." *Id.* The article did not attribute its reporting on the underlying scheme to the UK FCA beyond this statement. *Id.* Jennions was not mentioned in the article, he was not one of the anonymous traders cited, and he did not communicate with the reporter before the article was published.

According to the CFTC, the Bloomberg article prompted the Commission's Division of Enforcement to open an investigation a few days later, on or about June 19, 2013. Two CFTC staff members contacted the UK FCA one day before the investigation commenced to discuss the UK FCA's statement in the Bloomberg article. The UK FCA explained

that it had not opened a formal investigation, was only reviewing certain transactions that might have influenced WM/R rates, and had not identified indicia of wrongdoing. At that time, the UK FCA did not identify any whistleblowers. *Id.* The CFTC therefore concluded it could proceed independently by requesting information directly from banks.

Almost a month later, after issuing information requests to select financial institutions, the CFTC sent the UK FCA a letter requesting information concerning complaints relating to the WM/R benchmark and asking the UK FCA to facilitate contact with any whistleblower willing to speak with the Commission. SJ_ROA0000301. The UK FCA reached out to Jennions, but neither disclosed his identity to the CFTC nor shared any information he provided to them per their policy that prohibits disclosure. *Id.*; *see also* SJ_ROA0000353. Although Jennions told the UK FCA that he was willing to meet with the CFTC, the Commission—before learning his identity or receiving any information he shared with the UK FCA—ultimately abandoned efforts to contact him. SJ_ROA0000302. The CFTC received no information from Jennions through the UK FCA prior to the successful enforcement action against the relevant financial institutions. SJ_ROA0000302.

## C.

In November 2014, the CFTC issued five Orders ("Covered Actions") filing and settling charges against five banks—Citibank N.A., JPMorgan Chase Bank N.A., UBS AG, The Royal Bank of Scotland plc, and HSBC Bank plc.—for attempted manipulation of global foreign exchange benchmark rates, particularly the WM/R Rates. SJ_ROA0000099. Monetary penalties totaled $1.4 billion. *Id.* On February 2, 2015, the Commission posted the first four of five notices of the Covered Actions inviting whistleblower award applications

in connection with the successful enforcement action against each bank. Respondent's Br. 17–18; *see, e.g.*, U.S. COMMODITY FUTURES TRADING COMMISSION, "Notice of Covered Action No. 2015-010 - JPMorgan Chase Bank, N.A. Award Claims Due No Later than May 4, 2015" (February 2, 2015), https://www.whistleblower.gov/notices/2015-010. The final notice was posted on February 13, 2015.

On April 30, 2015, Jennions submitted a whistleblower award application asserting that he was a "critical source of information" whose February 11, 2015 Form Tip, Complaint, or Referral ("TCR")[1] submission and communications with the UK FCA initiated a cross-border investigation that led to the Covered Actions. SJ_ROA0000001; SJ_ROA0000057; SJ_ROA0000064–67. In his application, Jennions did not claim to have direct contact with the CFTC before his February 2015 TCR, nor did he claim to be a source for the Bloomberg Article. The Commission's Whistleblower Office notified Jennions that it intended to recommend denial of his claim "because the information he provided to the Commission did not lead to the successful enforcement actions referenced in his Award Applications" and noted that Jennions did not "*g[i]ve the Commission*" the information that led to the successful resolution of the enforcement action. SJ_ROA0000313–14 (emphasis in the original). Jennions responded with a letter from the UK FCA confirming that their office "received intelligence" from him and conducted inquiries based, in part, on his information. SJ_ROA0000329. However, the UK FCA declined to state that the inquiries prompted the CFTC to

---

1 Jennions first contacted the CFTC on February 11, 2015, three months after the Commission issued its November 2014 orders, by submitting a TCR with information that he provided to the UK FCA. SJ_ROA0000001.

investigate the relevant financial institutions. SJ_ROA0000330–31.

On February 9, 2022, the Commission's Whistleblower Claims Review Staff ("CRS") issued preliminary determinations for all award applications related to the Covered Actions and recommended denying them all because no claimant's original information led to the successful enforcement of the Covered Actions for purposes of Rule 165.2(i). *See, e.g.*, SJ_ROA0000346–57. In addressing Jennions's award application specifically, the CRS determined that he was ineligible for an award based on either his February TCR submission or as a derivative source for information the Commission obtained from the UK FCA or the Bloomberg Article. SJ_ROA0000353–57. In particular, the CRS determined that the information provided by Jennions was not sufficiently specific or credible and that they were "unable to act" on the information he provided without additional information or context from the UK FCA or him. SJ_ROA0000355–56. Jennions requested the materials the Commission relied on to make their determination and ultimately requested reconsideration, essentially recycling his prior arguments. He further raised for the first time that the Commission's Office of the General Counsel improperly influenced the CRS.

On March 12, 2025, the Commission issued its Final Determinations denying Jennions's application. The CFTC concluded that the Bloomberg Article—not his submissions—prompted the Commission's investigation, reiterated that his information was not sufficiently specific, credible, or timely to have caused the investigation, and determined that his undue-influence arguments were unsupported. SJ_ROA0000473–85. Jennions timely filed a petition for review of the Commission's denial of his whistleblower application.

**II.**

We have jurisdiction to review the denial of Jennions's application under 7 U.S.C. § 26(f)(2).

Whistleblower determinations "shall be in the discretion of the Commission." 7 U.S.C. § 26(f)(1). We "review the determination made by the Commission in accordance with section 706[] of" the Administrative Procedure Act, *id.* § 26(f)(3).[2] Thus, we will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is deemed arbitrary and capricious when it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When reviewing agency factfinding, as we do here, "there is no material difference between the APA's 'arbitrary and capricious' standard and its 'substantial evidence' standard." *Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016).

**A.**

Jennions contends that the Commission's decision to deny his whistleblower award application under 17 C.F.R. §

---

2 The code provision specifies "Section 7064 of Title 5," but the United States Code Annotated notes that the proper section "[p]robably should be section 706." 7 U.S.C. § 26(f)(3), n.2 (internal quotations removed).

165.2(i)(1) was arbitrary, capricious, and contrary to the evidence before the agency. As explained above, an applicant qualifies for an award under this provision only if he provides "original information that was sufficiently specific, credible, and timely to cause the Commission staff to commence an examination, [or] open an investigation" and the Commission brings a successful action based in whole or in part on the original information supplied by the applicant.[3] 17 C.F.R. § 165.2(i)(1). Jennions maintains that he has satisfied that requirement because he provided original information to the UK FCA, and that information, as referenced in the Bloomberg article, prompted the Commission's investigation. Petitioner's Br. 18–20. Although he does not dispute that the Bloomberg article triggered the investigation, he argues that the UK FCA's statement within the article necessarily contributed to the Commission's decision to begin the investigation and cannot be "disentangled from the rest" of the article's content. Petitioner's Br. 24; *see also* SJ_ROA0000224 (Div. of Enf. Decl. ¶ 3). He relies on the UK FCA spokesperson's comment that "[t]he [UK] FCA is aware of these allegations and has been speaking to the relevant parties," SJ_ROA0000235, and he asserts that he is the reason the UK FCA was "aware" of potential WM/R rate manipulation and the impetus for the UK FCA's outreach to the "relevant parties" referenced. Petitioner's Br. 19–21. To bolster his claims, Jennions attempts to treat the article's independent, detailed allegations of WM/R rate manipulation as "corroborative" of the UK FCA's brief statement, asserting that all of the statements in the article "describe[] the same conduct" he reported to the UK FCA. *Id.* at 20–22. He further contends that the UK FCA's

---

3 There are two other pathways for satisfying the "led to the successful enforcement" requirement. 17 C.F.R. §§ 165.2(i)(2), (3). Here, Jennions does not rely upon either of these alternative paths, so we will not reach the other grounds. Petitioner's Br. 17 n.5.

statement, however limited, must have been credible, as "two Commission staff members . . . call[ed] the FCA" before the CFTC opened its investigation to gather information. *Id.* at 24.

We disagree. We hold that the Commission's conclusions and denial of Jennions's application are supported by substantial evidence. The record demonstrates that the Commission opened its investigation based on the article's "specific explanation of how the traders were manipulating rates," not the "single-sentence quote that 'the FCA is aware of these allegations and has been speaking to the relevant parties'" or any information it otherwise obtained from the UK FCA or Jennions. SJ_ROA0000479–81(CFTC Final Order 7–9); SJ_ROA0000260–66 (Division of Enforcement Declaration). As described above, the article provides detailed descriptions of the alleged misconduct, including how traders conducted the manipulations and shared their strategies across banks. Jennions has not met his burden of showing that the Commission's conclusions that the specific entries in the Bloomberg article caused the CFTC to open an investigation are implausible or are counter to the evidence before us. As the Commission explained in its Final Order and highlighted on appeal, "the whistleblower program is designed to incentivize persons with knowledge of misconduct to come forward and share their information with the Commission[.]"[4] Respondent's Br. 37 (citing 76 Fed. Reg. 53172, 53181; 17 C.F.R. § 165.5(a)); *see also* J.A. 481 (CFTC's Final Order at 9

---

4 Jennions's contention that he provided the Commission with original information "through the UK FCA" is the sort of argument a petitioner may also bring under 17 C.F.R. § 165.2(*l*)(2), which permits a whistleblower to qualify for an award when original information is initially provided to a "foreign futures authority." Since Jennions does not proceed under this provision or claim to have made this type of submission, we do not need to reach this ground.

("The whistleblower program is premised upon encouraging people to come forward with information[.]")). There is an "expectation that the information . . . [is] high quality, reliab[le], and specific[]" such that there is a "meaningful nexus to the Commission's ability to successfully complete its investigation." 76 Fed. Reg. at 53177.

Even setting aside that Jennions did not provide the information directly to the CFTC, the lone, vague, non-substantive reference in the Bloomberg article to the UK FCA's awareness of "allegations" offers no insight into the nature of misconduct at issue and thus cannot reasonably be deemed "specific," especially in light of the other far more detailed references in the article. *See id.* Nor is there any basis for the proposition that detailed information supplied by independent contributors (i.e., the traders and other non-anonymous sources in the article) is necessarily attributable to other contributors (like the UK FCA) merely because the information appears within the same publication addressing a similar subject. So even if we were to assume, without deciding, that the UK FCA's statement as quoted in the article communicated any "original information" Jennions provided, his claim would still fail as this quotation was not the type of specific and credible information that the CFTC whistleblower award program was created to reward. *See id.* Though "[w]e of course recognize that a whistleblower does not always know the full picture of a scheme," they still "must provide some actionable detail." *Kitchen v. Commodity Futures Trading Comm'n*, 177 F.4th 1226, 1232–33 (D.C. Cir. 2026). Actionable details were not provided by Jennions through the UK FCA's statement in the article.

13

**B.**

The Commission also rejected Jennions's claim that the CFTC's Office of the General Counsel ("OGC") improperly influenced the Claims Review Staff in violation of the Commission's rules. Jennions contends that OGC "improperly influenced" the CRS by "supplant[ing] the Whistleblower Office during the claims review process" and participating in the Commission's final agency determination in a manner that was arbitrary, capricious or otherwise contrary to the Commission's rules. Petitioner's Br. 27–38. He bases this assertion on his efforts to obtain additional materials after receiving the CRS's Preliminary Determination denying his award application.

Under 17 C.F.R. § 165.7(g)(2)(i), a claimant may request to review the materials that formed the basis of the CRS's Preliminary Determination, and regulations specify the universe of materials available. *See* 17 C.F.R. § 165.10. After receiving the Preliminary Determination, Jennions requested those materials. Unsatisfied with the initial production, he sought additional information, including the identities of the CRS members and the staff who drafted the Preliminary Determination, to verify that the CRS was "properly constituted" and that OGC had not exerted "undue influence." SJ_ROA0000432. He identified no document or communication suggesting a violation of the rules.

The Commission responded that Jennions was not entitled to the requested materials, including the composition of the CRS, because "Rule 165.10(b) states that '[t]he rules in this part do not entitle a claimant to obtain from the Commission any materials (including pre-decisional or internal deliberative process materials that are prepared to assist the Commission or the Claims Review Staff in deciding the claim) other than those

listed in paragraph (a) of this section.'" SJ_ROA0000434 (quoting 17 C.F.R. § 165.10(b)). Composition of the CRS is not expressly listed in Rule 165.10 as subject to disclosure. Jennions nonetheless asserted, without any factual support, that "we must assume that OGC unduly influenced, and perhaps even drafted, the Preliminary Determination, contrary to Commission regulations." SJ_ROA0000424. The Commission rejected Jennions's arguments in its Final Determination, explaining that the relevant rules state that "the OGC *must* make a legal sufficiency review, not that the OGC *must not* do anything else" that the Commission, within its authority, deems appropriate. SJ_ROA0000485 (emphasis in original). The Commission further noted that "while Rule 165.15(a)(2) excludes the Office of General Counsel from the Claims Review Staff, it does not follow that were the Office of General Counsel to take any other role it would be undue influence." *Id.* The Commission ultimately found that Jennions contentions were not support by the record. *Id.*

We agree with the Commission's conclusion. As an initial matter, Jennions identifies no evidence that the OGC participated in the CRS's determinations. His argument rests instead on speculation that misconduct *may* have occurred during the process, largely because the CFTC did not disclose internal materials and declined to confirm whether OGC participated in his proceedings. Respondent's Br. 26–27; *see also* Petitioner's Reply Br. 16. Speculation is insufficient to overcome the "highly deferential" arbitrary and capricious standard, which "presumes agency action to be valid." *Lead Indus. Ass'n, Inc. v. Env't Prot. Agency*, 647 F.2d 1130, 1145 (D.C. Cir. 1980) (citation modified).

Jennions likewise does not explain which stages of the award process were supposedly affected or how any involvement by OGC altered the outcome of his application.

So even assuming the OGC participated in the Claims Review Staff's decision and that its participation violated the Commission's regulations, Jennions still fails to identify any prejudice from that alleged violation. *See Air Canada v. Department of Transp.*, 148 F.3d 1142, 1156 (D.C. Cir. 1998); *see also* 5 U.S.C. § 706. But "[a] party claiming harm from an agency's failure to follow its own rules must demonstrate some form of prejudice." *Schaefer v. McHugh*, 608 F.3d 851, 854 (D.C. Cir. 2010). As we have explained, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (quoting *PDK Labs., Inc. v. U.S. Drug Enforcement Administration*, 362 F.3d 786, 799 (D.C. Cir. 2004)) (citation modified). Without credible evidence of specific prejudice affecting the outcome of Jennions's whistleblower application, we will not set aside the CFTC's denial. *See DSE, Inc. v. United States*, 169 F.3d 21, 31 (D.C. Cir. 1999).

\* \* \*

We therefore deny the petition for review consistent with the conclusions made by the Commission.

*So ordered*.